THE PEOPLE OF THE STATE OF NEW YORK ex rel. GERTRUDE CRANE, as Administratrix, etc., of GEORGE W. SAUER, Deceased, Relator, *v.* MAURICE SIMMONS and Others, as and Constituting the Board of Assessors of the City of New York, and THE CITY OF NEW YORK, Respondents.

First Department, July 2, 1920.

**Municipal corporations — grading of One Hundred and Fifty-fifth street, city of New York — evidence not establishing public use prior to establishment of street grade — when adjoining owner not entitled to award.**

Certiorari to review the action of the board of assessors of the city of New York in dismissing the relator's claim for damages alleged to have been sustained by a change of grade of West One Hundred and Fifty-fifth street in the city of New York, the claimant contending that a former grade had been established by user during the period from 1854 to 1886 different from the grade first legally established in 1886. Evidence examined, and *held,* that there was no public use of that portion of One Hundred and Fifty-fifth street prior to its being regulated and graded in 1886, and that any use of the premises for recreation by the public or the mere passing thereover by a straggling footpath was not such a use as entitled an adjoining owner to damages for a change of grade.

First Department, July, 1920.          [Vol. 192.

CERTIORARI issued out of the Supreme Court and attested on the 10th day of December, 1919, directed to Maurice Simmons and others, as and constituting the board of assessors of the city of New York, commanding them to certify and return to the office of the clerk of the county of New York all and singular their proceedings had in dismissing the relator's claim for damages claimed to have been sustained by a change of grade of West One Hundred and Fifty-fifth street, in the city of New York.

*John M. Harrington* of counsel and attorney [*Herbert H. Gibbs* with him on the brief], for the relator.

*Charles J. Nehrbas* of counsel [*John P. O'Brien, Corporation Counsel*], for the defendants.

DOWLING, J.:

The relator is the administratrix of the goods, chattels and credits of the late George W. Sauer, who died on March 8, 1905, seized of the premises situate at the southwest corner of Eighth avenue and West One Hundred and Fifty-fifth street, in the borough of Manhattan, city of New York, having a frontage of forty-nine feet eleven inches on Eighth avenue and a depth of one hundred and seventy-five feet on West One Hundred and Fifty-fifth street. There was formerly a public resort on the premises known as the Atlanta Casino, used for recreation and amusement purposes, which was destroyed by fire in 1898.

The relator herein has already been adjudged entitled to recover the damages to said premises sustained by a change of grade due to the construction of a viaduct in West One Hundred and Fifty-fifth street from St. Nicholas Place to Macomb's Dam Bridge. (See *People ex rel. Crane* v. *Ormond,* 178 App. Div. 151; affd., 221 N. Y. 283.) She now seeks to recover further damages alleged to have been sustained by reason of a change of the grade of One Hundred and Fifty-fifth street, on its lower level, from a claimed grade established by user in the part of the One Hundred and Fifty-fifth street adjoining the premises in question, during the period from 1854 to 1886 (and perhaps from an earlier date) to the grade first legally established in 1868, and to which it was physically worked in 1886.

The premises in question were bought by John Gerken in 1881, beginning with the corner plot at One Hundred and Fifty-fifth street and Eighth avenue, in dimensions twenty-five feet in width on the avenue and one hundred feet in depth on the street. He erected a three-story frame building thereon. The elevated railroad was then running on Eighth avenue which was regulated and graded, and the terminus of the road was immediately in front of the property. West One Hundred and Fifty-fifth street had not yet been filled in up to the established grade. Gerken thereafter acquired the rest of the plot and added to the building. The premises were sold to George W. Sauer July 1, 1886, who remained in possession thereof until the time of his death. They were used continuously for general amusement purposes.

It is the contention of the relator that prior to the completion of the grading of One Hundred and Fifty-fifth street in 1886 to the grade legally established in 1868, that street had been in continuous use for pedestrian travel for many years, certainly as far back as 1854, and that a grade had thus been established, the change from which entitles the relator to recover damages. Relator claims that this original grade was the natural grade as it existed when the city acquired title to the street in 1837.

The situation of One Hundred and Fifty-fifth street at the point in question was an unusual one. The direct testimony as to conditions there goes back as far as 1854, and is given by a witness who in his boyhood had lived in the vicinity and was well acquainted with it. At that time Macomb's Dam across the Harlem river which was constructed pursuant to a resolution of the common council of New York city on January 10, 1814, touched the present borough of Manhattan at a point about one hundred and fifty feet south of One Hundred and Fifty-fifth street, in the block between the present One Hundred and Fifty-fourth and One Hundred and Fifty-fifth streets. The dam was removed and a wooden bridge built somewhere around 1860. To the west was a high bluff, at a point west of Bradhurst avenue. In the bed of Eighth avenue was a brook, with a cove at high water, which was located at the present situation of Bradhurst avenue. High water reached to about the middle of One Hundred and Fifty-fifth street. At Eighth avenue near

First Department, July, 1920.                    [Vol. 192.

the present line of One Hundred and Fifty-fifth street was a small bridge which crossed the brook, at that point about twelve feet wide at high water. · At low water it was but three feet wide, and sometimes entirely dry. This bridge was made of two or three planks with a handrail on each side. From the Manhattan end of the dam or bridge to the bluff, the road was over this bridge, and then to the site of the present One Hundred and Fifty-fifth street and up to the bluff to the west by a path which is described as a " crooked path," which " went around at high water; you could go straight only at low water; at high water there was a cove in there and then there was a brook down to One Hundred and Forty-eighth street." This is the brook already referred to as being in the bed of Eighth avenue. The path led to the bluff, access to which was gained at first by old stone steps and afterwards by wooden steps. This path was used by residents of Carmansville going to Morrisania as well as by others. The witness Richards had become familiar with it from the time he was ten years old, and had often traversed it on his way to fish in the North river. The buildings on the lot in question were the first ones erected between the bluff and the Harlem river at this point. On cross-examination the witness testified that part of the land between the bluff and the Harlem river was marsh land, especially at high water; that prior to 1882 there were no streets running east and west in this locality, nor any running north and south, save Macomb's Dam road; that the path before described did not run in a bee line, but followed the shore line approximately, and at high water the path ran in further to conform to the upland, and necessitated a deviation of fifty feet to the side. The path varied from one to two feet in width, with short grass on each side. There were no curbs or sidewalks, of course, until Eighth avenue was regulated and graded.

Another witness, Reeves, who had been connected with the construction of the elevated railroad up to One Hundred and Fifty-fifth street, testified that before Eighth avenue was filled in and graded there were two paths from the bluff to the avenue; one a " little path " running to the south, just east of the bluff; another to the northwest leading into " Lovers' Lane " and thence to High bridge. Later when the elevated railroad

station was built, a wooden viaduct was built above the bed of One Hundred and Fifty-fifth street to connect Washington Heights with the station. He admits that the Sauer property connected with that structure. At that time the bed of the street was used for an amusement ground. On cross-examination he admitted that the neighborhood there was all meadows and there was nothing to show the existence or line of One Hundred and Fifty-fifth street, nor any physical indication thereof. He identified the path marked on the survey of 1861 as corresponding approximately with his recollection of the old path. The wooden viaduct was eight feet in width, afterwards enlarged to fourteen feet. He testified that " Lovers' Lane " was a path five or six feet wide, " and when you got down to One Hundred and Fifty-fifth street I presume it was the same width." He claims that One Hundred and Fifty-fifth street was always used for public travel, to his recollection.

There is in evidence a map of One Hundred and Fifty-fifth street and vicinity as shown in the field notes of Blackwell's survey of the northerly portion of Manhattan island, made about 1861. This shows a narrow and irregular path marked " Path to Macomb's Dam " in a part of the bed of the present One Hundred and Fifty-fifth street, extending for a portion of the block between Bradhurst avenue and Eighth avenue. The survey shows the lines of neap tide and mean tide and also the high grass ordinarily growing on mud flats. It indicates a high-water line intersecting the southerly side of One Hundred and Fifty-fifth street at a point forty-five feet west of the westerly line of Eighth avenue; also that the high grass began to grow at the intersection of the prolonged line of One Hundred and Fifty-fifth street with a point twenty-five feet east of the westerly line of Eighth avenue; and also at the intersection of the prolonged line of Eighth avenue with a point ten feet north of the southerly line of One Hundred and Fifty-fifth street. It depicts a marshy country, and indicates an irregular and broken path to the dam.

The grading of Eighth avenue between One Hundred and Twenty-eighth street and the Harlem river, north of One Hundred and Fifty-fifth street, was begun under a contract made December 6, 1875, and completed October 12, 1878. There-

after the wooden structure before referred to was built over to the bed of One Hundred and Fifty-fifth street, between Eighth avenue and the foot of the bluff, to which access was had by wooden steps. After the erection of this structure it was solely used by people who desired to go along One Hundred and Fifty-fifth street, as the bed of the street was obstructed. Access to the Sauer property, as has been said, was had by a connecting wooden gangway, and in like manner to a hotel at the Bradhurst avenue corner, conducted by Grasmuck Brothers. In 1879 the elevated railroad on Eighth avenue was open to traffic.

At this period pedestrian traffic through One Hundred and Fifty-fifth street was on a wooden viaduct forty feet above the level of the street. There was very little use of the lower level. In fact, Gerken used material excavated in constructing his building to fill in, grade and fix up One Hundred and Fifty-fifth street for a distance of one hundred and seventy-five feet from Eighth avenue (the whole depth of his property) to look like a park, made pathways, used it as a picnic grounds and had a band of music there. The level was raised an average of three and one-half feet. All this was in the bed of the street, and occurred about 1882. Gerken testified that Kessel, who conducted a resort just to the west, also had the bed of One Hundred and Fifty-fifth street leveled off as he did. Persons engaged in the ordinary course of affairs would use the wooden viaduct in between Eighth avenue and the bluff, and those who used the physical level of the street were picknickers, and those strolling through the adjoining country. Even at this time there was nothing to indicate the north line of One Hundred and Fifty-fifth street; it was all a natural park, much used by pleasure seekers. The only indications of the south line of the street were the buildings on Gerken's property.

When One Hundred and Fifty-fifth street was regulated and graded in 1886, the wooden viaduct was removed.

Upon the record herein, I am convinced that there was no use of One Hundred and Fifty-fifth street as a street prior to its being regulated and graded in 1886. The only use made of it prior to that date was on the viaduct far above its level. The occupation of the bed of the street for a pleasure resort was

no use for street purposes, nor was its occasional use by picnickers or holiday crowds as an incident to a trip into the surrounding country such a use. Neither does the earlier travel upon a pathway along the waterfront, varying with the conditions of the tide, constitute a use as a street. A mere narrow, straggling, varying footpath, one to two feet wide, over a strip of dry land between the growth of grass on the marshes used by casual pedestrians is not such a use for street purposes as constitutes a grade by public use, a departure from which entitles an adjacent property owner to damages, when the time comes that a city street is actually regulated and graded, and happens to include within its lines a small portion of such a primitive pathway.

The writ is dismissed and the determination of the board of assessors affirmed, with fifty dollars costs and disbursements.

CLARKE, P. J., SMITH, MERRELL and GREENBAUM, JJ., concur.

Writ dismissed and proceedings affirmed, with fifty dollars costs and disbursements.